UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| April A. Blair, | Case No. 17-cv-4536 (SER) |
|---|---|
| Plaintiff, | **ORDER** |
| v. | |
| Nancy A. Berryhill,<br>Acting Commissioner of Social Security, | |
| Defendant. | |

---

STEVEN E. RAU, United States Magistrate Judge

Pursuant to 42 U.S.C. § 405(g), Plaintiff April A. Blair ("Blair") seeks review of the Acting Commissioner of Social Security's ("Commissioner") denial of her application for social security income ("SSI") and disability insurance benefits ("DIB"). *See* (Compl.) [Doc. No. 1]. The parties filed cross-motions for summary judgement. (Pl.'s Mot. for Summ. J.) [Doc. No. 17]; (Def.'s Mot. for Summ. J.) [Doc. No. 21]. For the reasons set forth below, the Court denies Blair's Motion for Summary Judgement and grants the Commissioner's Motion for Summary Judgement.

I.  BACKGROUND

   A.  **Procedural History**

Blair protectively filed for SSI and DIB on January 30, 2014, citing an alleged onset date ("AOD") of June 12, 2012, which was later amended to October 12, 2012. (Admin. R.) [Doc. No. 11 at 10]. Blair claimed disability due to fibromyalgia, stroke, aneurysms, carpal tunnel syndrome, chronic headaches, joint pain, short-term memory loss, depression, and anxiety. (*Id*. at 241). Blair's claim was denied initially and upon reconsideration. (*Id*. at 10). Following a hearing, the administrative law judge (the "ALJ") denied benefits to Blair on May 9, 2016. *See* (*id*. at 7–28). The

Appeals Council denied Blair's request for review, rendering the ALJ's decision final. (*Id.* at 1–3); *see also* 20 C.F.R. § 404.981.[1] Blair initiated the instant law suit on October 4, 2017. (Compl.).

### B. Factual Background

At the time of her AOD, Blair was thirty-eight years old which makes her a younger individual. (Admin. R. at 26); *see also* 20 C.F.R. § 404.1563. Blair completed high school and has a cosmetology license and experience as a cashier, dietary aide, cosmetics salesperson, collection clerk, charge-account clerk, survey worker, cosmetologist, and pizza maker. *See, e.g.*, (Admin. R. at 211–231, 242–243, 314).

#### 1. Blair's Testimony

At the hearing, Blair testified as follows. Blair takes care of her three-year-old son and lives with her twenty-two-year-old daughter. (*Id.* at 41, 43). Blair last worked in a kitchen for a nursing home with employment ending February of 2015. (*Id.* at 42) She would show up on time for her scheduled hours, but would go home if she could not work through her headaches (*Id.*). Blair testified that she terminated her employment with the nursing home because the time constraints to complete her work were too stressful. (*Id.* at 42, 46–47). Further, Blair testified that she has not sought new employment because of the unpredictability of her headaches which occur three to four times a week and typically last a minimum of six hours. (*Id.* at 43).

#### 2. Medical Evidence[2]

---

[1] Blair applied for both DIB and SSI, which each have a separate set of regulations. *See* 20 C.F.R. Pt. 404, Subpt. P; 20 C.F.R. Pt. 416, Subpt. I. The regulations referred to in this Order have parallel citations in each set of regulations. *Compare* 20 C.F.R. § 404.1520 *with* 20 C.F.R. § 416.920. For ease of reference, the Court will only refer to the regulations regarding DIB, 20 C.F.R. Pt. 404, Subpt. P.

[2] The Court has reviewed the entire administrative record but summarizes only the evidence necessary to provide context for the issues before the Court. The issues asserted by Blair are that the ALJ erred in the manner which the ALJ evaluated the medical opinions of: State agency psychological consultants ("State consultants"); Lori Tingle, MA, LP ("Tingle"); Dr. Michael J. McGrath ("Dr. McGrath"); and Dr. Thomas Bergquist ("Dr. Bergquist"). *See* (Pl.'s Mem. in Supp.

Blair was admitted to the hospital on June 12, 2012, for an induction of labor, and while in labor underwent a cesarean procedure because of complications. (*Id*. at 496). Blair complained of a severe headache and had difficulty speaking during the procedure. (*Id*.). After the procedure, a CT scan of Blair's head showed a hemorrhage in the left temporal lobe. (*Id*.). Blair had expressive aphasia throughout her hospital stay, and received physical therapy and occupational therapy until she was discharged on June 24, 2012. (*Id*.). Blair also had issues with speech, memory, comprehension, headaches, attention, and a decline in intellect as a result of the brain hemorrhage secondary to an aneurysm. *See, e.g.*, (*id*. at 1481–86). Blair had continued issues with slowed speech with hesitation and difficulties with word retrieval. *See, e.g.*, (*id*. at 566–567, 667–703). Blair continued with speech therapy and made improvements by comprehending more complex material. (*Id*. at 728–729). On December 18, 2012, Blair was discharged from speech therapy because her speech therapist, Linda Tyler ("Tyler"), believed Blair had achieved her maximum benefit. (*Id*. at 908). Specifically, Tyler noted Blair could actively participate at the conversational level with occasional hesitancy and minimal pauses for word retrieval. (*Id*.). Blair experiences severe headaches affecting her on a daily basis, and the headaches have become more intense with a pain rating ranging from three out of ten to eight out of ten. (*Id*. at 1026, 1076, 1482). Blair also suffers from impaired memory that has become worse after the AOD. (*Id*. at 1482, 1484–85, 1992).

### 3. Lori Tingle

Tingle is Blair's therapist at Southwestern Mental Health Center and has seen Blair weekly since May, 2015. (*Id*. at 49, 51). Tingle testified before the ALJ stating that Blair suffers from side effects as a result of her brain injury. (*Id*. at 50–51). Tingle testified that Blair has memory loss in different areas including short-term memory and when stressed she will miss appointments if she is

---

for Summ. J., "Blair's Mem. in Supp.") [Doc. No. 18 at 4–34]. The Court focuses on these determinations in its analysis. *See Hepp v. Astrue*, 511 F.3d 798, 806 (8th Cir. 2008) (stating the claimant waived issues not raised before the district court).

not reminded. (*Id*. at 52–53). Tingle testified that when Blair has a migraine it becomes very difficult to function and that Blair's ability to interact with others is unpredictable and varies from day to day. (*Id*. at 51–53). Tingle stated that Blair is unsuited for work and has difficulty in her life due to cognitive impairment which includes difficulty remembering the focus of conversations and often requiring redirection to the topic of the conversation. (*Id*. at 1524–1525, 2460). Tingle reported that Blair has migraines three to four days a week and is unable to function with a migraine. (*Id*. at 2460).

### 4. Dr. Michael J. McGrath

Dr. McGrath conducted a two-day neuropsychological evaluation of Blair on December 4, 2014, and December 9, 2014. (*Id*. at 1481–86). Dr. McGrath observed from a personal evaluation that Blair was of dullish-normal intellect, was responsive to interview questions, and spoke clearly. (*Id*. at 1481). Dr. McGrath also observed that Blair has concentration and memory issues, but can operate a motor vehicle without spatial confusion. (*Id*. at 1482). Blair obtained an intelligence quotient[3] ("IQ") score of 71, which is a score in the third percentile and lower than her estimated pre-hemorrhage IQ of 85. (*Id*. at 1483). The drop in fourteen points between the scores showed a clinically meaningful decline in intellect.[4] (*Id*.). Dr. McGrath also observed that Blair's memory falls within the "mildly mentally retarded range," but Dr. McGrath stated that Blair's memory may be underestimated because she is unable to process information quickly. (*Id*. at 1484). Dr. McGrath observed that Blair's auditory attention is in the "mildly mentally retarded range" which scored in the second percentile and her visual attention scored within the 0.1 percentile. (*Id*. at 1484). Because of these problems Dr. McGrath opined that Blair needs to avoid situations requiring concentration and attention. (*Id*.). Blair's auditory memory was found to be in the "mildly mentally retarded range' at

---

[3] Intelligence quotient is "a score . . . used to denote a person's standing relative to age peers on a test of general ability, ordinarily expressed as a ratio between the person's score on a given test and the score that an average person of comparable age attained on the same test." *Intelligence Quotient (IQ)* 747250, Stedman's Medical Dictionary, Westlaw (database updated Nov. 2014).
[4] A clinically meaningful decline refers to a difference in scores that occur in less than five percent of the population. (Admin. R. at 1483).

the 0.1 percentile and visual memory in the first percentile indicating that she has very marked memory impairment. (*Id*. at 1485). Dr. McGrath opined that "it would be important to communicate fairly simply in terms of both vocabulary and grammar," that information input to Blair should be slowed, and that Blair likely retains the capacity to do routine and repetitive work. (*Id*. at 1485–86). Dr. McGrath suggested that it would be psychologically beneficial for her to continue with at least some part-time employment. (*Id*. at 1486).

### 5. Dr. Thomas Bergquist

Dr. Bergquist evaluated Blair at the Mayo Clinic. (*Id*. at 1564–67, 2354–55, 2364–67). Dr. Bergquist observed that Blair continues to have severe cognitive dysfunction and her ability to make complex decisions, especially medical and legal decisions, is somewhat questionable. (*Id*. at 2366). Blair obtained a score of 14 on the Patient Health Questionnaire[5] ("PHQ–9") and a score of 20 on the Generalized Anxiety Disorder survey ("GAD–7"), which according to Bergquist, was quite elevated.[6] (*Id*. 2354). Despite these scores, however, Dr. Bergquist opined that there was no indication that Blair had a desire to harm herself or to harm others. (*Id*. at 2355). Dr. Bergquist further opined that Blair would benefit from the help of her mother and other supportive individuals to overcome her functional disabilities. (*Id*. at 2367).

### 6. State agency psychological consultant

Upon reconsideration, the State consultant examined the medical evidence and opined on February 2, 2015, that Blair was not disabled. (*Id*. at 82–99). The State consultant suggested that

---

[5]  The PHQ–9 is a "multipurpose instrument for screening, diagnosing, monitoring and measuring the severity of depression. It is a brief self-report tool." *STABLE Resource Toolkit*, Center for Quality Assessment and Improvement in Mental Health, *available at* http://www.cqaimh.org/pdf/tool_phq9.pdf. Scores of 5–9 indicate minimal depression symptoms, scores of 10–14 indicate minor depression symptoms, scores of 15–19 indicate moderately severe depression symptoms, and scores over 20 indicate severe depression symptoms. *Id*.

[6]  "The GAD–7 is a seven-item anxiety scale for screening generalized anxiety disorder and assessing its severity." *Dereje v. Colvin*, No. 12-cv-3010 (DSD/TNL), 2014 WL 625862, at *6 n.11 (D. Minn. Feb. 18, 2014) (Leung, Mag. J., as adopted by Doty, J.).

5

Blair's impairments could be expected to produce some of the symptoms, but the alleged intensity of the symptoms and how they affect Blair's functioning is inconsistent with the totality of the medical evidence. (*Id*. at 90). The State consultant opined that Dr. McGrath's medical findings should be given great weight because the findings explained the discrepancies in Blair's tests scores and her ability to perform simple day-to-day tasks. (*Id*. at 92). The State consultant further opined that Blair's ability to perform day-to-day activities, despite her mental impairments, should be given greater weight. (*Id*.) The State consultant also suggested that Blair's reports are only partially credible because of the inconsistency of symptoms in her reports. (*Id*.). The State consultant found that Blair has memory impairments with understanding and remembering instructions, impairments with social interaction, and limitations in adaptation. (*Id*. at 95–96). The State consultant opined that Blair had the ability to perform past relevant work and was not disabled. (*Id*. at 98).

### 7. ALJ's Decision

Consistent with the Social Security Administration's regulations, the ALJ conducted the five-step eligibility analysis. (*Id*. at 10–28); *see also* 20 C.F.R. § 404.1520(a). At step one, the ALJ determined that Blair has not engaged in substantial gainful activity since October 18, 2012. (Admin. R. at 12). At step two, the ALJ found that Blair had the following severe impairments: cerebral vascular accident with aphasia, history of fibromyalgia, migraines, cognitive disorder, mood disorder, anxiety disorder, and personality disorder. (*Id.*).

At step three, the ALJ considered Listings 11.04 (central nervous system vascular accident), 11.03 (neurological disorders), 12.02 (neurocognitive disorders), 12.04 (depressive and bipolar disorders), 12.06 (anxiety and obsessive-compulsive disorders), and determined that Blair does not have an impairment or combination of impairments that meet or are medically equivalent to one of the Listings. (*Id.* at 13–14). At step four, the ALJ determined that Blair had the residual functioning capacity ("RFC"):

> To perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except [Blair] can lift and/or carry twenty-five pounds frequently and fifty pounds occasionally; she can stand and/or walk six hours out of an eight-hour workday with normal breaks, and she can sit six hours out of an eight-hour workday with normal breaks; she can handle noise exposure not above the moderate level as defined in the SCO; she is limited to occupations which do not require frequent verbal communication; she can understand, remember, and carry out short, simple instructions and interact appropriately with coworkers on an occasional basis; and she can have no contact with the general public as part of her job.

(*Id*. at 15–16).

In forming the RFC, the ALJ first considered Tingle's opinions and determined that Tingle's opinions and suggestions would be given little weight. (*Id*. at 17). The ALJ gave little weight to Tingle's opinion because it was inconsistent with the objective medical evidence and with Blair's initial function report. (*Id*. at 17) Specifically, the ALJ concluded that Tingle's opinions and suggestions:

> are inconsistent with the objective medical findings of record described in detail below. Further, they are inconsistent with [Blair's] initial function report in which she claimed no problems with personal care, she performed household chores such as laundry, she got outside daily, she drove, she shopped in public stores, and she could handle finances.

(*Id*. at 17) (citation omitted).

The ALJ then considered two medical statements from Tingle dated August 11, 2015 ("Statement One"), and March 30, 2016 ("Statement Two"). (*Id*. at 23); *see also* (*id.* at 1523–26, 2460). In Statement One, Tingle noted that Blair had extreme limitations in various areas of mental functioning in a home or work environment.[7] (*Id.* at 1523–26). Areas which were marked to have extreme limitation by Tingle were Blair's ability: to remember locations and work-like procedures; understanding and remembering short and simple instructions; carrying out short and simple instructions; maintaining attention and concentration for more than two hours; sustaining an ordinary routine without special supervision; completing a normal workday and workweek without

---

[7] An extreme limitation is defined as "no useful ability to function in this area." (Admin. R. 1524).

interruptions from psychological-based symptoms; perform at a consistent pace without an unreasonable number of breaks; and tolerating normal levels of stress. (*Id*. at 1524). Tingle also noted in Statement One that Blair would likely miss more than three days of work a month from her symptoms. (*Id*. at 1525).

In Statement Two, Tingle opined that Blair's migraines are unpredictable, that Blair would be unable to function while a migraine was present, and that Blair could not follow a work schedule because of the migraines. (*Id*. at 2460). Tingle stated that it was her opinion that Blair would be unable to work through a migraine and that the unpredictability and frequency of Blair's migraines made her unable to work consistently. (*Id*.).

The ALJ gave little weight to both Statement One and Statement Two because they were inconsistent with Blair's initial function report that indicated Blair was able to perform a variety of household activities independently. (*Id*. at 24); *see also* (*id.* at 249–257). In giving little weight to these statements, the ALJ concluded that, "both medical source statements are inconsistent with objective medical findings from other medical providers . . . who consistently found the claimant had Global Assessment Functioning scores suggesting only mild to moderate limitations." (*Id*. at 24).

After considering Tingle's opinions, the ALJ noted that evidence in the record showed that Blair was receiving skilled speech therapy and had improved to a functional speech level. (*Id*. at 17–18); *see also* (*id.* at 866–68). The ALJ then considered Blair's Global Assessment Functioning ("GAF") scores in which Blair received a score of 55.[8] (*Id*. at 18); *see also* (*id.* at 1123–27). The ALJ concluded that the GAF score was consistent with the objective medical finding that Blair has difficulties with functioning, but is able to perform household tasks. (*Id*. at 18). The ALJ gave substantial weight to the GAF score because, "[i]t is agreed that the objective medical evidence of

---

[8] The Global Assessment Functioning score is a clinicians scoring of an individual's psychological, social, and occupation functioning on a scale of 0-100. (Admin. R. at 18). A rating of 55-60 indicates moderate difficulty in social, occupation, or school functioning. (*Id*.).

record supports a finding that [Blair] can function socially and occupationally at a point where she can work." (*Id*. at 19). The ALJ then referenced additional GAF scores that resulted in scores of 50–55 and 55–60 and that these GAF scores would be given great weight because, "[these GAF scores are] consistent with a majority of the [GAF] scores of record." (*Id*. at 19–20); *see also* (*id.* at 1119–27, 1520, 1600).

The ALJ then considered Dr. McGrath's evaluation of Blair on December 4, 2014, and December 9, 2014. (*Id*. at 21, 1481–86). Dr. McGrath tested Blair's IQ in which Blair obtained a score of 71, which suggested that her IQ was on the low-borderline range. (*Id*.). Dr. McGrath opined that Blair needed to be communicated with in simple terms, and that written instructions would be useful. (*Id*.). Dr. McGrath suggested that Blair was functioning well emotionally and that she likely retained the ability to perform routine repetitive work. (*Id*.). The ALJ gave substantial weight to Dr. McGrath's findings because, "[Dr. McGrath] is an acceptable medical source . . . who based his findings on a personal evaluation of [Blair]. Further, the determination that [Blair] remained capable of routine, repetitive work is consistent with . . . [Blair's] restrictions caused by her combination of impairments . . . ." (*Id*. at 21); *see also* (*id.* at 249–257, 1481–86).

The ALJ then noted that mental health treatment records from February 19, 2015, indicated that Blair was taking care of her son and visiting friends. (*Id*. at 21); *see also* (*id.* at 1606). On this same date, Blair received a GAF score of 65 which indicated that she had mild difficulties in social, occupational or school functioning. (*Id*. at 1612). The ALJ gave "substantial but not significant weight" to this score because, "the objective medical evidence of record supports a finding that [Blair] can function socially and occupationally at a point where she can work" but the ALJ also

9

concluded that "a finding that [Blair] has moderate mental symptoms and restrictions is supported."[9] (*Id*. at 21–22).

The ALJ then considered the reports of the State consultant's evaluation of Blair's medical record. (*Id*. at 25). The ALJ gave little weight to the State consultant's initial review of Blair's record, where the state found that Blair had non-severe mental impairments. (*Id*. at 25); *See also* (*id*. at 71–81). The ALJ gave little weight to the initial review because, "[the review] is inconsistent with [Blair's] long history of mental health treatment and the determinations of acceptable medical sources." (*Id*. at 25). On reconsideration, the State examined Blair's record and found that Blair had severe mental impairments that caused: mild restrictions on daily living, moderate restrictions in social functioning, one or two repeated episodes of decompensation, and moderate difficulty concentrating. (*Id*. at 25); *see also* (*id.* at 83–99). The ALJ gave substantial weight to the State consultant's opinion on reconsideration. Substantial weight was given to the State consultant's opinion on reconsideration because "[t]here is general support for the State Agency consultant's opinions, including the objectively assessed mental impairments in evidence, which do cause some restrictions." (*Id*. at 25); *see also* (*id.* at 1481–86, 1520, 1600).

At step five, the ALJ found that although Blair was unable to perform her past relevant work, there were jobs that exist in significant number in the national economy that she can perform. (*Id*. at 26). Therefore, the ALJ concluded that Blair was not disabled. (*Id*. at 27).

## II. DISCUSSION

### A. Legal Standard

If "substantial evidence" supports the findings of the Commissioner, then these findings are conclusive. 42 U.S.C. § 405(g). The Court's review of the Commissioner's final decision is

---

[9] The Court understands "significant weight" to be a greater level of weight than "substantial weight" in the context of the ALJ's decision in the weighing of the evidence in accordance with 20 C.F.R. § 404.1527.

deferential because the decision is reviewed "only to ensure that it is supported by substantial evidence in the record as a whole." *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003) (internal quotation marks omitted). The Court's task is limited "to review[ing] the record for legal error and to ensur[ing] that the factual findings are supported by substantial evidence." *Id*. This Court must "consider evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Burnside v. Apfel*, 223 F.3d 840, 843 (8th Cir. 2000).

A court cannot reweigh the evidence or "reverse the Commissioner's decision merely because substantial evidence would have supported an opposite conclusion or merely because [a court] would have decided the case differently." *Harwood v. Apfel*, 186 F.3d 1039, 1042 (8th Cir. 1999).

B.  Analysis

Blair argues that she is entitled to summary judgment for two reasons: (1) the ALJ failed to consider the opinions of Tingle, Dr. McGrath, Dr. Bergquist, and the State consultant in accordance with administrative regulations; (2) the ALJ failed to provide good, specific, and supported reasons for rejecting Blair's limitations, and that there is not substantial evidence to support the ALJ's decision. (Blair's Mem. in Supp. at 4–34).

1.  Medical Opinions

Blair argues that the ALJ "failed to acknowledge the deference warranted to [Tingle's] opinion as a treating **specialist**." (Blair's Mem. in Supp. at 14–15). Blair's argument is unpersuasive because the ALJ accounted for Tingle's opinions in accordance with agency regulations. *See* (Admin. R. at 17). The ALJ concluded that some of the limitations opined by Tingle were inconsistent with the objective medical record. (*Id*.). Specifically, the ALJ noted that Tingle's opinions "are inconsistent with [Blair's] initial function report in which she claimed no problems with personal care, she performed household chores such as laundry, she got outside daily, she drove, she shopped

11

in public stores, and she could handle finances." (*Id.*). The ALJ found that Blair's initial function report was corroborated by Dr. McGrath's evaluations of Blair as well as other evidence in the medical record. (*Id.* at 18–24, 1481–86). *See Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2001) (when there is contradictory evidence in the record, "[the Eighth Circuit has] upheld an ALJ's decision to discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence." (internal quotation marks omitted)). Tingle's opinions were inconsistent with Blair's initial function report which is supported by Dr. McGrath's personal evaluation of Blair and because "[i]t is the function of the ALJ to weigh conflicting evidence and to resolve disagreements among physicians," the ALJ properly discounted Tingle's testimony in accordance with agency regulations. *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).

Blair then goes on to argue that the ALJ only accounted for portions of Dr. McGrath's findings that supported the ALJ's adverse disability determination. (Blair's Mem. in Supp. at 21). This argument, however, is not compelling because the ALJ included Dr. McGrath's opined limitations in the RFC. (Admin. R. at 15–16). For example Dr. McGrath suggested that, "in dealing with [Blair], it was important to communicate fairly simply in terms of both vocabulary and grammar. [Dr. McGrath] noted simple written input could be used with [Blair] and when novel concepts were to be presented, they should be done in small, logical steps." (Admin. R. at 1485). The ALJ noted these limitations in her discussion and included them in the RFC which states: "[Blair] is limited to occupations which do not require frequent verbal communications; [Blair] can understand, remember, and carry out short, simple instructions and interact appropriately with coworkers on an occasional basis; and she can have no contact with the general public as part of her job." (*Id.* at 16). Blair's argument is not persuasive because substantial evidence suggests that the ALJ incorporated Dr. McGrath's opined limitations into the RFC. (*Id.*)

Blair then argues that the ALJ committed reversible error by failing to discuss the opinions of Dr. Bergquist. (Blair's Mem. in Supp. at 13). The ALJ did not specifically mention Dr. Bergquist by name in her opinion. The ALJ, however, is not required to specifically cite to every medical opinion when examining the record and forming the RFC. *See Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted. An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered.") (citation omitted). In the instant case, the ALJ cited to a portion of the record where Dr. Bergquist's evaluation was located and included information from the evaluation regarding Blair's medical and work history. *Compare* (Admin. R. at 1564–1567) ("[Blair] works at a local pizza place from 9 a.m. to 2 p.m. on Sundays."), *with* (Admin. R. at 22) ("Speech treatment records . . . reflect that [Blair] was working at a friend's pizza business every Sunday."). Even if the facts alleged in Blair's argument were true, the ALJ failing to specifically mention Dr. Bergquist's reports is not grounds for reversal so long as evidence suggests the opinion was considered. *See England v. Astrue*, 490 F.3d 1017, 1022 (8th Cir. 2007) ("Although the ALJ did not discuss these reports, an ALJ's failure to cite specific evidence does not indicate that it was not considered.") (citation omitted). In the instant case, the ALJ cited to the exhibit and page range in which one of Dr. Bergquist's reports was located, suggesting that the ALJ incorporated Dr. Bergquist's opinions into her discussion. *See* (*id.* at 22). Therefore, Blair's argument alleging that the ALJ failed to account for Dr. Bergquist's testimony is unpersuasive.

Blair further argues that the ALJ improperly weighed the evidence by giving substantial weight to the State consultant's examination upon reconsideration. (Blair's Mem. in Supp. at 22). Blair asserts that Tingle's opinion, as a treating source, should have been given more weight than the State consultant's opinion. (*Id.*). The Court views this argument as an attempt by Blair to have this Court reweigh the evidence, which it will not do. Rather, the Court examines the record and "[i]f substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it

would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007). The ALJ gave substantial weight to the State consultant's opinion because "[t]here is general support for the State Agency consultant's opinions, including the objectively assessed mental impairments in evidence, which do cause some restrictions. Also, the [GAF] scores of record provide general support for the findings, along with the claimant's continued activities of daily living." (Admin. R. at 25). The ALJ listed multiple sources in the record which corroborate the State consultant's findings on reconsideration. For example, "[t]here is general support for the State Agency consultant's opinions including the objectively assessed mental impairments in evidence . . . the [GAF] scores of record provide support for the findings, along with [Blair's] continued activities of daily living." (*Id.*); *see also* (*id.* at 249–57, 1119–27, 1520, 1600). As a result, the ALJ's determinations to the State consultant are supported by substantial evidence in the record as a whole.

### 2. Specific Reasons

Blair asserts that if the RFC conflicts with opinions of medical sources the ALJ must provide good, specific, supported reasons as to why the conflicting opinions were not adopted. (Blair's Mem. in Supp. at 4). It is the Court's duty to "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). Applying this standard to the instant case, the ALJ discredited Tingle's opinion because it was inconsistent with the objective medical findings in the record and was also inconsistent with Blair's initial function report. (Admin. R. at 17). The ALJ then gave substantial weight to Dr. McGrath's testimony and took into account Dr. McGrath's opined limitations when forming the RFC. (Admin. R. at 21).

As discussed above, the ALJ considered Dr. Bergquist's opinions because portions of his opinions appear in the ALJ's discussion of how the RFC was formed which is supported by substantial evidence. *See* (*id.* at 15–16, 22). Consequently, the ALJ did not commit reversible error in

the manner she discredited the conflicting opinions and this Court should "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Pelkey*, 433 F.3d at 578 (quoting *Guilliams*, 399 F.3d at 801). In sum, Blair failed to demonstrate the ALJ's decision was unsupported by substantial evidence.

### III. CONCLUSION

Based on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff April A. Blair's Motion for Summary Judgement [Doc. No. 17] is **DENIED**;

2. The Acting Commissioner of Social Security's Motion for Summary Judgement [Doc. No. 21] is **GRANTED**; and

3. This case is **DISMISSED**.

**LET JUDGEMENT BE ENTERED ACCORDINGLY**

Dated: July 19, 2018

*s/Steven E. Rau*
STEVEN E. RAU
United States Magistrate Judge